Filed 3/25/14  P. v. Lara CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B241963 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. LA066038) |
| v. | |
| JUAN LARA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Joseph A. Brandolino, Judge.  Affirmed.

David D. Carico, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Mary Sanchez and Taylor Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant Juan Lara appeals from the judgment entered upon his jury conviction of first degree murder.  He contends the trial court abused its discretion in denying his *Marsden*[1] motion, and that he received ineffective assistance of counsel.  He also contends the lying in wait special circumstance is unconstitutionally vague.  We disagree and affirm the judgment.

### FACTUAL AND PROCEDURAL SUMMARY

At about 4:40 p.m. on March 30, 2007, 17-year-old Jason Aguilar was shot in front of a house in Van Nuys, where he lived with his parents, Zoila and Hugo, and his older brother, Marco.[2]  Some time before the shooting, Zoila had taken her grandchildren to a park.  While there, she received a call for Jason on her cell phone, which he occasionally used.  She told the unidentified male caller that Jason was at home, and she gave out the Aguilars' home phone number.  At the family home, Jason answered calls on the home phone and on Hugo's cell phone, which he also occasionally used.  Several minutes later, Elfigo Rodriquez, a cousin who had stopped by the Aguilars' home, answered a knock at the front door.  The man at the door asked for Jason, who went outside to talk to him.

Hugo had gone to pick up his wife at the park, and on their way back, they saw Jason talking to the driver of a Bronco parked in their driveway.  Their view of the driver was obscured by the partially rolled-down car window.  Jason confirmed the driver had called his mother earlier.  A family friend, Tony Menjivar, also saw Jason by the Bronco, but he did not pay attention to the driver.

Jason briefly went back into his bedroom and then went out again.  Soon afterwards, his parents and Rodriguez heard gunshots, ran outside, and saw the driver of the Bronco shooting at Jason.  Two of the gunshot wounds Jason received were fatal.

---

[1] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

[2] To avoid confusion, we use first names to refer to persons with the same last name.

Jason had methamphetamine in his bloodstream. A plastic baggie containing a substance resembling methamphetamine was recovered from the scene.

The murder weapon was found tossed outside a restaurant six miles north of the Aguilars' home. Defendant initially was excluded as a potential contributor of DNA found on the weapon, but on retesting with new software, defendant no longer could be excluded.

The Bronco defendant drove in March 2007 was registered in Juan Martinez's name as a favor to defendant. On the evening after the shooting, defendant asked Martinez to report it stolen, and Martinez obliged. The Bronco was found two months later. DNA lifted from cigarette butts found inside the car matched defendant's profile. His young son's sweater was draped over the driver's seat. Police noted a phone number was written in a spiral notebook found in the Bronco, but the notebook was not collected.

Defendant used a cell phone number registered in the name of Ana Lopez, his son's mother. That number appeared under defendant's nickname "Brujo," spelled "Bruho," in Jason's cell phone address book. Calls from that phone number were placed in Los Angeles, and specifically in the Van Nuys area, until about 1:30 p.m. on March 30, 2007. No further calls were made from that phone until the next day, when the phone was traced to Bakersfield and Santa Clarita. The day after that, the phone was traced back to Los Angeles and then north to Oregon.

Defendant was arrested in Bakersfield on April 27, 2007. The cell phone was in his possession, but defendant denied it was his. He also denied knowing Jason, driving a Bronco, or having been in Los Angeles at the time of the murder. In recorded phone calls from jail, defendant solicited testimony to confirm he had lived in Bakersfield since February 2007 and had not been in Los Angeles on March 30, 2007. In another call, defendant explained he planned to say he had used the Bronco for his job, but had left it with its owner before going to Bakersfield, and it must have been stolen. He denied telling Martinez to report the Bronco stolen, and he tried to arrange a change in Martinez's testimony so as to conform to his version.

3

Although Jason's relatives had seen the Bronco and its driver in the neighborhood and by the house in the months before the shooting, no eyewitness was able to identify defendant in a photographic lineup shortly after the shooting, or in a live lineup several months later. Zoila identified someone else as resembling the shooter in the lineups. She identified defendant as the shooter for the first time at the preliminary hearing in March 2008. At trial, Zoila explained she had been confused earlier and defendant's appearance had changed between the shooting and the live lineup; he had gained weight and no longer had a moustache and hair. Detective Mojarro confirmed it was difficult to pick defendant out at the live lineup because by then he had no facial hair and his head was shaved. An old photograph of defendant, showing a much thicker moustache than that on his booking photo in April 2007, had been used in the photographic lineup.

In one of the other photographs in the lineup, Zoila recognized Juan Sanchez, a person known to the Aguilar family from playing soccer with Marco on a team that Hugo had coached in the past. Zoila did not pick out Sanchez as the shooter. However, Hugo, Rodriguez, and Menjivar thought that Sanchez resembled the driver of the Bronco. At trial, Hugo was sure that defendant, and not Sanchez, was the shooter, but by then he already had seen defendant at the preliminary hearing. Rodriguez and Menjivar were unsure of their choice at the time they made it. Moreover, Menjivar did not participate in the 2007 lineups, but was shown a photographic array by a defense investigator only in 2012. Unlike the other witnesses, Menjivar did not claim to have seen the driver of the Bronco before the day of the shooting. Marco did not see the driver of the Bronco on the day of the shooting, and could not positively identify defendant. Although Marco had seen Sanchez riding in the passenger seat of the Bronco once, he was sure he had not seen Sanchez drive it.

Sanchez lived in Van Nuys with the Orellana brothers, William and Henry. The three of them were arrested on April 5, 2007 for Jason's murder, but were later released. Cell phone records showed several calls between phones used by Sanchez and William between 3:42 p.m. and 7:00 p.m. on the day of the murder. After Detective Mojarro accused William of calling Jason before the murder, William stated he had lent his phone

4

to someone, eventually identifying that person as Brujo. According to William, Sanchez told him that they were arrested because William had lent defendant his phone, and the detective had promised to help William with his deportation case.

William identified defendant as "Brujo" in a photographic lineup even though he was difficult to recognize in the photograph. William claimed he saw defendant in the Bronco a few blocks from the Aguilars' home on the day of the murder. Defendant asked William to use his cell phone, which actually was registered to Sanchez. Defendant first called a woman and took down a phone number. In a subsequent call, he asked for "a 20 of meth" and said he would pick it up in three minutes. He then showed William a gun and told him to listen for gunshots. When defendant left, William called Sanchez to recount the run-in with defendant and to ask if Sanchez had heard rumors about a murder.

Sanchez knew defendant from the neighborhood and had ridden in the Bronco once. He claimed defendant called him after the shooting to ask if someone had died and said "that sometimes happens to people who get in trouble with me." Sanchez also told police defendant claimed to have been wronged by his "homeboys" and they were "all going to pay for it." According to Sanchez, William told him a couple of days after the shooting that he was worried because he had lent his phone to defendant. At the time of the shooting, Sanchez's cell phone records placed him in Van Nuys, several miles away from the crime scene. Sanchez could not be excluded as a contributor of DNA on the murder weapon, and a jailhouse informant claimed Sanchez told him that he had a problem with a "soccer buddy" who was "talking shit" behind his back and that he "had to handle [his] business."

In 2010, defendant was charged with murder, with additional allegations that he personally discharged a handgun causing death and that he committed the murder by means of lying in wait. A prior serious strike felony conviction and prison term also were alleged. The jury convicted defendant of first-degree murder and found the gun use and lying in wait allegations to be true. The court found true the prior conviction and prison term allegations. Defendant was sentenced to life in prison without the possibility of parole, with additional 25 years on the gun enhancement and five years on the prior.

5

This appeal followed.

## DISCUSSION

### I

Defendant argues the court abused its discretion in denying his *Marsden* motion without inquiring into his trial counsel's failure to retain an expert on eyewitness identification.

"""When a defendant seeks to discharge his appointed counsel and substitute another attorney, and asserts inadequate representation, the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of the attorney's inadequate performance. [Citation.] A defendant is entitled to relief if the record clearly shows that the first appointed attorney is not providing adequate representation [citation] or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result [citations]' [Citations.]"' [Citation.] Denials of *Marsden* motions are reviewed under an abuse of discretion standard." (*People v. Barnett* (1998) 17 Cal.4th 1044, 1085.)

Depending on the nature of the defendant's contentions, the court may need to inquire into the attorney's state of mind if "a satisfactory explanation for counsel's conduct toward his client is necessary to determine whether counsel can provide adequate representation." (*People v. Turner* (1992) 7 Cal.App.4th 1214, 1219.) However, a defendant's disagreement with counsel's trial preparation and strategy does not trigger the duty of inquiry. (*Ibid.*)

The *Marsden* hearing defendant challenges occurred approximately one month after his appointed counsel was assigned to the case. Counsel advised the court he had reviewed some but not all evidence and asked for a continuance to review DNA evidence. Defendant stated he had a problem with counsel and needed an expert because the eyewitnesses had not picked him out at the lineups, but had identified him at the preliminary hearing. The court responded that defense counsel would have to decide whether a motion for the appointment of an eyewitness expert was appropriate. The court explained that counsel could argue defendant's identification at the preliminary

6

hearing was suggestive because he was "the only one there," and "[a] lot of that is common sense." The court also explained that what issues to raise in defense is a matter of strategy. Defendant complained that all counsel and he did was "just argue about stuff," and counsel kept telling him what "the D.A. said." His specific complaint had to do with the state of DNA evidence rather than eyewitness identification. The court noted counsel was new to the case and appeared to be "doing the preparation." Defendant then asked whether he should talk to counsel "so he can do the motions." The court confirmed that he should, assured him that "[i]f issues arise, I'll be happy to hear them," and urged that he leave legal decisions to counsel.

At another *Marsden* hearing, three months later, appellant continued to complain about his two appointed attorneys, one of whom handled the DNA evidence. At the time, he was specifically concerned about witness subpoenas and DNA testing. The failure to request an expert on eyewitness identification was not among his complaints at that hearing. Our review of both *Marsden* hearings indicates defendant had continued to have tactical disagreements with his appointed attorneys, often misunderstood or mistrusted the attorneys' explanations, and failed to ask the attorneys questions to which he needed answers.

The record does not indicate that defendant continued to insist on the need for an expert on eyewitness identification after the initial *Marsden* hearing. The court's failure to question defense counsel on the issue of eyewitness identification at that hearing was not an abuse of discretion. It is clear from the record that the attorney appearing at the hearing was new to the case, had not yet reviewed all of the evidence, and had not developed a defense strategy.

Moreover, the court was correct that expert testimony is generally unnecessary on issues of common knowledge, including "the psychological factors affecting eyewitness identification." (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 995.) Such evidence ordinarily is needed only when "'an eyewitness identification of the defendant is a key element of the prosecution's case but is not substantially corroborated by evidence giving it independent reliability.'" (*People v. Jones* (2003) 30 Cal.4th 1084, 1111.) In such

7

cases, expert testimony may be necessary to explain "specific psychological factors shown by the record that could have affected the accuracy of the identification but are not likely to be fully known to or understood by the jury." (*People v. McDonald* (1984) 37 Cal.3d 351, 377, overruled on another point in *People v. Mendoza* (2000) 23 Cal.4th 896, 914.) In reply, defendant inconsistently argues that the suggestiveness of in-court identification could not be established without expert testimony, but counsel was not necessarily ineffective in failing to call an expert on eyewitness identification; rather, defendant's claim is that counsel would have been ineffective if he failed to consult such an expert. The record does not show that counsel failed to prepare on the subject of eyewitness identification, whether by consulting an expert or written sources on that subject.

The record also does not bear out defendant's assumption that eyewitness identification was a key element of the prosecution's case against him. The fact that the parents had seen defendant at the preliminary hearing was explored during their examination. In closing argument, the prosecutor acknowledged that the in-court identifications were questionable and declined to offer them as "significant pieces of evidence." Defense counsel in turn emphasized that the prosecution had "abandoned" the in-court identification of defendant as the shooter "for obvious reasons." It is, thus, unlikely the jury convicted defendant based primarily on eyewitness identification.

It also is not clear how an expert on eyewitness identification would have made a difference in this case. A number of witnesses testified defendant was difficult to recognize in the photographic and live lineups because his appearance had changed. Defendant takes issue with their apparently inaccurate perception of his weight, but he does not address the fact that he had a thick moustache in the old photograph used in the photographic lineup, a significantly thinner moustache on his booking photo in April 2007, and no facial hair in the live lineup.

Defendant argues an expert would have established that the eyewitnesses' familiarity with Sanchez increased the accuracy of their identification of him. But the identification of Sanchez was not as solid as defendant suggests. Of the three

8

eyewitnesses who picked out Sanchez, only Hugo admitted to have known him, from having coached him in the past.  But Hugo did not name Sanchez as a suspect, aside from selecting his photograph.  Zoila, who recognized Sanchez in the photograph, did not pick him out as the shooter.  There is no evidence the other two eyewitnesses knew Sanchez, and both were unsure of their choice.  Menjivar's identification was particularly weak because he was shown a lineup five years after the shooting, and he admitted he had not paid attention to the driver.

There was substantial additional evidence to support defendant's culpability. Several witnesses testified defendant drove the Bronco in March 2007 and told the registered owner to report it stolen on the evening of March 30.  There was evidence that the number of the phone Lopez got for defendant's exclusive use was in Jason's phone address book, that defendant used drugs, that he had arranged to buy methamphetamine from Jason by using William's phone, and that a substance resembling methamphetamine was found at the crime scene.  Cell phone records of the phone defendant used placed him in Van Nuys on the day of the murder but showed he did not make calls on that phone in the afternoon, corroborating the testimony that defendant borrowed William's phone.  Defendant's calls from jail supported an inference that he was attempting to arrange for an alibi that would place him in Bakersfield at the time of the shooting and would distance him from the stolen car report.  DNA evidence tied defendant to cigarette butts in the Bronco, and on retesting he no longer could be excluded as a contributor of DNA on the murder weapon.  None of the evidence was inherently improbable, and the fact that individual pieces of evidence were subject to impeachment is not dispositive if the evidence cumulatively corroborated the reliability of defendant's identification.  (See *People v. Jones*, *supra*, 30 Cal.4th at p. 1112.)

II

Defendant argues defense counsel provided ineffective assistance in various respects.  A claim of ineffective assistance of counsel requires showing that counsel's performance was so deficient that it prejudiced the defense.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687.)

9

## A. Exclusion of Jason's Gun

Defense counsel stipulated to the exclusion of evidence that Jason had a gun in his bedroom because he considered the evidence irrelevant to the defense. The court later ruled defendant's drug use and Jason's drug dealing were relevant since the prosecution's theory was that defendant set up the murder under the pretense of a drug buy. Defendant argues the presence of the gun in Jason's bedroom made it less likely that defendant killed Jason and more likely that the shooter was a rival drug dealer. He also argues that the exclusion of the gun benefitted the prosecution by focusing the case on defendant's drug use and away from Jason's drug dealing. Defendant's theory of the relevance of the gun is speculative. The jury heard testimony that defendant used drugs and set up a drug buy. That, along with the presence of methamphetamine at the scene, allowed the jury to infer that Jason sold drugs. Thus, Jason's drug dealing was not kept from the jury. But to establish third party culpability, "there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*People v. Hall* (1986) 41 Cal.3d 826, 833.) There was no evidence that Jason was murdered by a rival drug dealer, and the gun, even in combination with the evidence of drug dealing, would not have raised such an inference.

## B. Third-Party Culpability Instruction

Defendant argues counsel was deficient in proposing a third-party culpability instruction that the trial court rejected because the same instruction had been found to be "unduly argumentative" in *People v. Hartsch* (2010) 49 Cal.4th 472, 504 (*Hartsch*). The rejected instruction in *Hartsch*, on which the proposed instruction in this case was based, read: "'Evidence has been presented during the course of this trial indicating or tending to prove that someone other than the defendant committed, or may have had a motive and opportunity to commit, the offense(s) charged. In this regard, it is not required that defendant prove this fact beyond a reasonable doubt. [¶] The weight and significance of such evidence are matters for your determination. If after consideration of all of the evidence presented, you have a reasonable doubt that the defendant committed the offense(s) charged, you must give the defendant the benefit of the doubt and find him not

10

guilty.'" (*Id*. at p. 504.) While the court found the instruction unduly argumentative, it also reaffirmed its position that omission of a proper pinpoint instruction of third-party culpability "is not prejudicial because the reasonable doubt instructions give defendants ample opportunity to impress upon the jury that evidence of another party's liability must be considered in weighing whether the prosecution has met its burden of proof. [*Citations*.]" (*Ibid*.) Since a third-party culpability instruction was unnecessary under *Hartsch*, counsel's offer of the rejected instruction, even if erroneous, was not prejudicial.

### C. Instructions on Eyewitness Identification

Defendant argues counsel failed to ensure the jury was directed to consider factors relevant to eyewitness identification, such as the eyewitnesses' inability to identify him at lineups, suggestive influences on their identification, and the failure to conduct a voice-only lineup. In determining whether the omission of an instruction prejudiced the defense, we consider the record as a whole, including other instructions given and the arguments of counsel. (*People v. Cain* (1995) 10 Cal.4th 1, 36–37.)

The court instructed the jury with a version of CALCRIM 315, which listed several factors for evaluating identification testimony: "Did the witness know or have contact with the defendant before the event? [¶] How well could the witness see the perpetrator? [¶] What were the circumstances affecting the witness's ability to observe, such as lighting, weather conditions, obstructions, distance, and duration of observation? [¶] How closely was the witness paying attention? [¶] Was the witness under stress when he or she made the observation? [¶] Did the witness give a description and how does that description compare to the defendant? [¶] How much time passed between the event and the time when the witness identified the defendant? [¶] Was the witness asked to pick the perpetrator out of a group? [¶] Did the witness ever fail to identify the defendant? [¶] Did the witness ever change his or her mind about the identification? [¶] How certain was the witness when he or she made an identification? [¶] Are the witness and the defendant of different races? [¶] Were there any other circumstances affecting the witness's ability to make an accurate identification?"

11

Absent from the court's instruction was the factor "[w]as the witness able to identify the defendant in a photographic or physical lineup?" The comments to CALCRIM No. 315 say this factor should be given "if requested and factually appropriate." While the factor may have been factually appropriate in this case, its omission was not prejudicial since the jury was asked to consider whether the witnesses ever failed to identify defendant. Defendant faults counsel for not requesting that the court include in the instruction a factor listed in CALJIC No. 2.92, "Whether the witness' identification is in fact the product of [his][her] own recollection." The jury was directed to consider "other circumstances affecting the witness's ability to make an accurate identification," and nothing prevented it from considering whether the suggestive nature of the identification at the preliminary hearing affected the accuracy of the in-court identification. (See *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1144 [no prejudice from failure to give defense pinpoint instruction where other instructions did not preclude jury from finding for defendant and counsel explained the defense to the jury].) As we already explained, in closing the prosecutor conceded the in-court identifications were questionable.

A defendant has a right to a voice-only lineup if eyewitness identification is a material issue "and there is a reasonable likelihood of a mistaken identification which a voice lineup would tend to resolve." (*Garcia v. Superior Court* (1991) 1 Cal.App.4th 979, 987–989.) Defendant argues the jury should have been instructed that the prosecution or defense may compel a voice-only lineup when it is material, but it is unclear what defendant's instruction would have accomplished in this case. Defendant cites no evidence that either Zoila or Rodriguez could recognize the voice of the person they had spoken to on the day of Jason's murder. Defendant relies on his private counsel's unsupported representations that Zoila allegedly had told police she recognized the voice on the phone on the day of the murder as the voice of "someone who played soccer." At the preliminary hearing, Zoila did not admit to making that statement and testified she did not recognize the voice of the person whose call she answered in the park.

12

*D. Closing Argument*

Defendant contends that his counsel's closing argument was ineffective. Closing arguments are "inherently tactical," and judicial review of them is "highly deferential." (*Yarborough v. Gentry* (2003) 540 U.S. 1, 6; *People v. Freeman* (1994) 8 Cal.4th 450, 498.)

In closing, counsel focused on the third-party culpability defense, presenting seven pieces of evidence pointing to Sanchez as the shooter. The first one was Sanchez's arrest, which defendant argues was a misstatement of the law. A criminal defendant is, of course, presumed innocent until proven guilty beyond a reasonable doubt. (*People v. Aranda* (2012) 55 Cal.4th 342, 353.) But "the third-party evidence need not show 'substantial proof of a probability' that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt." (*People v. Hall*, *supra*, 41 Cal.3d at p. 833.) Although the prosecutor criticized counsel for bringing up Sanchez's arrest in closing, he acknowledged that Hugo's identification of Sanchez in the photographic lineup and evidence that a phone registered to Sanchez was used to call Jason were sufficient to arrest Sanchez. Counsel's reference to Sanchez's arrest was not improper since the arrest was based on evidence that independently supported the third-party culpability defense.

Defendant claims counsel's statement that DNA evidence linked Sanchez to the murder weapon was factually inaccurate. In elaborating on this statement, counsel clarified that Sanchez could not be excluded as a contributor of DNA, which was a correct statement of the facts. Defendant unfairly faults counsel for not commenting on what he characterizes as an unjustified conclusion in the second DNA report that, on retesting of the same DNA evidence, defendant could no longer be excluded as a contributor. The DNA expert had justified the new results as a product of retesting the same DNA with new, high resolution software.

Defendant argues the third-party culpability defense was undeveloped because counsel did not argue that Jason was a likely victim of a drug-related hit from "rival drug dealers or somebody in the chain of command." The record does not support that theory

of defense. Defendant speculates that because William's phone and three other phones in the construction company where Sanchez worked were in Sanchez's name, it was probable that Sanchez was a drug ring leader, supplying his dealers with prepaid disposable phones. The record shows Sanchez helped William buy a phone, for which William paid, because William did not have a social security number, and company phones could be bought at a discount. Sanchez's testimony that he knew "a kid, who had a gun, and he was going around selling" it, and that he had taken defendant to a friend's house to buy drugs hardly support defendant's proposed theory that Sanchez himself was a drug lord or rival drug dealer. Defendant also speculates that the witnesses were afraid to testify against Sanchez because he once had been in a gang. Although the prosecutor conceded it was possible the eyewitnesses changed their testimony to protect Sanchez, there is no evidence that Sanchez was an active gang member or that Jason's murder was gang related, and defendant does not fault counsel for failing to investigate.

Defendant faults counsel for failing to explain the significance of various factors relevant to eyewitness identification. The prosecutor argued that, at least to him, Sanchez and defendant looked similar. Defense counsel countered that cross-racial identification was not an issue in the case because all persons involved were from Central America. The jury was instructed that the attorneys' arguments were not evidence. The prosecutor's comment on his own inability to distinguish individuals in the lineups did not raise the issue of cross-racial identification since it was not evidence.

Counsel's decision to not dwell on the in-court identifications of defendant was clearly tactical since he emphasized the prosecutor's concession that the identifications were questionable. Similarly, counsel was not negligent in failing to educate the jury about studies suggesting the lack of correlation between a witness's confidence and the accuracy of the identification, in light of the prosecutor's concession that the in-court identifications were questionable despite the witnesses' expressed confidence in their accuracy. Counsel cannot be faulted for not arguing that familiarity with a witness increased the accuracy of identification since not all eyewitnesses who identified Sanchez knew him and not all witnesses who knew him identified him. (See *Yarborough v.*

14

*Gentry*, *supra*, 540 U.S. at p. 8 ["[w]hen counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect"].)

We find no discrete or cumulative error amounting to ineffective assistance of counsel.

## III

Penal Code section 189 defines first degree murder as including murders committed "by means of . . . lying in wait." Section 190.2, subd. (a)(15) establishes a special circumstance if "[t]he defendant intentionally killed the victim by means of lying in wait." The conviction of first degree murder exposes a defendant to the death penalty, life imprisonment without the possibility of parole (LWOP), or a 25-years-to-life prison term (§ 190, subd. (a)). (*People v. Superior Court* (*Bradway*) (2003) 105 Cal.App.4th 297, 305 (*Bradway*).) A true finding on the lying-in-wait special circumstance limits the penalty to the first two sentencing options. (*Ibid*.) Defendant argues that the special circumstance is indistinguishable from lying in wait first degree murder and therefore is unconstitutionally vague.

In non-capital cases, like defendant's, the challenge to the special circumstance "comes under the due process clause and 'rest[s] on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk.' [Citation.] Where there is no First Amendment right implicated, such due process challenges 'are examined in light of the facts of the case at hand; the statute is judged on an as-applied basis.' [Citation.]" (*Bradway*, *supra*, 105 Cal.App.4th at p. 309, quoting *Maynard v. Cartwright* (1988) 486 U.S. 356, 361–362.)

The court in *Bradway*, *supra*, 105 Cal.App.4th 297 explained that the adoption of Proposition 18 in March 2000, changed the phrase "while lying-in-wait" in the special circumstances statute to "by means of lying in wait" to conform with the lying-in-wait language defining first degree murder. (*Id*. at pp. 306–308.) As amended, the special circumstance statute "still requires the distinguishing element of intentional murder, 'thus eliminating murders where only implied malice has been established. [Citation.]'

15

[Citation.]"  (*Id*. at p. 311; see also *People v. Stevens* (2007) 41 Cal.4th 182, 203 [lying-in-wait special circumstance requires an intent to kill while lying-in-wait murder does not].)  Additionally, "the lying-in-wait special circumstance requires a physical concealment or concealment of purpose and a surprise attack on an unsuspecting victim from a position of advantage . . . .  [C]oncealment of purpose inhibits detection, defeats self-defense, and may betray at least some level of trust, making it more blameworthy than premeditated murder that does not involve surprise.  [Citation.]"  (*Id*. at pp. 203–204.)

Substantial evidence in this case established that defendant intended to kill Jason at the time he set up the drug buy.  He concealed his purpose, exploited Jason's false sense of security, and launched a surprise attack from a position of advantage.  The special circumstance was not constitutionally vague as applied to him.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EPSTEIN, P. J.

We concur:



WILLHITE, J.                              MANELLA, J.


16